1

2

3

4

5

6

7                         UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
8                                  AT SEATTLE

9

10   A. H. R., et. al.,                          CASE NO. C15-5701JLR

11                      Plaintiffs,              ORDER REGARDING MOTION
                                                 FOR PRELIMINARY
12          v.                                   INJUNCTION AND RELATED
                                                 MOTIONS
13   WASHINGTON STATE HEALTH
     CARE AUTHORITY, et al.,
14
                        Defendants.
15
                        I.      INTRODUCTION
16
            Plaintiffs A.H.R., S.K., K.A.S., Z.O.S.,[1] and K.V. are a group of infants and
17
     toddlers who, because of their complex medical needs, require skilled nursing services
18

19   _____

20          [1] On December 29, 2015, Plaintiffs' counsel notified the court and opposing counsel of
     the death of Z.O.S.  (Notice of Death (Dkt. # 49).)  The court notes that Federal Rule of Civil
21   Procedure 25 provides that if the claim is not extinguished the decedent's successor or
     representative may file a motion for substitution within 90 days after service of a statement
22   noting death.  Fed. R. Civ. P. 25(a)(1).  If the motion for substitution "is not made within 90 days
     after service of a statement noting death, the action by . . . the decedent must be dismissed."  *Id.*

1  around the clock.  Defendant Washington State Health Care Authority ("HCA"),[2] which

2  is the state agency responsible for administering Washington State's Medicaid program,

3  does not dispute that Plaintiffs are entitled in-home, private duty nursing care through the

4  Medicaid program.[3]  (*See* PI Resp. (Dkt. # 32) at 1 ("The issue here is *not* whether

5  [Plaintiffs] are entitled to medically necessary nursing services from the Medicaid

6  Program.  They are.").)  Despite this acknowledgement, HCA has failed to fully provide

7  these services to Plaintiffs.  The present suit arises from these circumstances.

8      Before the court are three motions:  (1) Plaintiffs' motion for a preliminary

9  injunction (PI Mot. (Dkt. # 6)); (2) HCA's motion to compel joinder of three managed

10  care organizations ("MCOs") or, in the alternative, for partial dismissal for failure to join

11  these allegedly indispensable parties under Federal Rule of Civil Procedure 19 (Rule 19

12  Mot. (Dkt. # 24)); and (3) HCA's motion to continue the noting date for Plaintiffs'

13  motion for a preliminary injunction (Mot. to Continue (Dkt. # 28)).  The court has

14  considered the motions, all related submissions from the parties, the balance of the

---

16  A statement noting death must be served on the parties as provided in Federal Rule of Civil
    Procedure 5 and on nonparty successors or representatives of the deceased as provided in Federal
17  Rule of Civil Procedure 4.  *See* Fed. R. Civ. P. 25(a)(3); *Barlow v. Ground*, 39 F.3d 231, 233-34
    (9th Cir. 1994).  The 90-day period within which a substitution motion may be made is not
18  ordinarily triggered until such service occurs.  *See id.*

19      [2] In addition to HCA, Plaintiffs have also sued Maryanne Lindebald, who is the state's
    Medicaid director and responsible for oversight of the state's Medicaid program, and Dorothy
20  Frost Teeter, who the director of HCA.  (*See* Compl. (Dkt. # 1) ¶¶ 17-18; Am. Compl. (Dkt. # 5)
    ¶¶ 19-20.)  Plaintiffs have sued both Ms. Lindebald and Ms. Teeter in their official capacities
    only.  (*See id.*)  The court refers to all Defendants collectively as "HCA."

21      [3] The services at issue in this case are known variously as in-home nursing, private duty
22  nursing, or the medically intensive children's program.  (*See* PI Resp. (Dkt. 32) at 7; Kreiger
    Decl. (Dkt. # 33) ¶ 4.)

ORDER- 2

1   record, and the applicable law.  In addition, the court heard the oral argument of counsel

2   on January 5, 2016.  Being fully advised, the court GRANTS Plaintiffs' motion for a

3   preliminary injunction as more fully described below,[4] DENIES HCA's Rule 19 motion,

4   and GRANTS HCA's motion to continue.

5                    **II.      FACTUAL BACKGROUND & FINDINGS OF FACT**

6            **A.  Statutory Framework**

7            Medicaid is "[one] element of a comprehensive plan to provide universal health

8   insurance coverage" and is designed "to meet the health care needs of the entire

9   nonelderly population with income below 133 percent of the poverty level."  *Nat'l Fed'n*

10  *of Indep. Bus. v. Sebelius*, --- U.S. ---, 132 S. Ct. 2566, 2606 (2012).  Medicaid is a

11  cooperative federal-state program that is jointly financed and administered by the states

12  according to federal guidelines.  42 U.S.C. §§ 1396 *et. seq.*; 42 C.F.R. § 430.0.  "Within

13  broad Federal rules, each State decides eligible groups, types and range of services,

14  payment levels for services, and administrative and operating procedures."  42 C.F.R.

15  § 430.0.  To receive federal funding, however, a state must comply with federal Medicaid

16  _____

17       [4] In accordance with Federal Rules of Civil Procedure 52(a) and 65(d), this order shall
    constitute the court's findings of fact and conclusions of law setting forth the grounds for

18  issuance of the preliminary injunction.  *See* Fed. R. Civ. P. 52(a); Fed. R. Civ. P. 65(d).
    Although the court has not labeled individual paragraphs specifically as findings of fact or

19  conclusions of law, such labels are not necessary.  *Microsoft Corp. v. Motorola, Inc.*, No. C10-
    1823JLR, 2013 WL 2111217, at *4 (W.D. Wash. Apr. 25, 2013).  The nature of the findings and

20  conclusions to follow is apparent.  *See Tri–Tron Int'l v. A.A. Velto*, 525 F.2d 432, 435-36 (9th
    Cir. 1975) ("We look at a finding or a conclusion in its true light, regardless of the label that the

21  district court may have placed on it. . . . [T]he findings are sufficient if they permit a clear
    understanding of the basis for the decision of the trial court, irrespective of their mere form or
    arrangement.") (citations omitted); *In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th

22  Cir. 1982) ("The fact that a court labels determinations 'Findings of Fact' does not make them so
    if they are in reality conclusions of law.").

law.  *See Armstrong v. Exceptional Child Ctr., Inc.*, --- U.S. ---, 135 S. Ct. 1378, 1382 (2015) ("Medicaid offers the States a bargain:  Congress provides federal funds in exchange for the State's agreement to spend them in accordance with congressionally imposed conditions.").

Each state must submit to the federal government a "State Plan for Medical Assistance," which describes how the state will administer Medicaid and assuring compliance with federal law.  *See id.*  The Centers for Medicare and Medicaid Services ("CMS") must approve the State Plan and any amendments.  *See* 42 C.F.R. §§ 430.10, 430.14; *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 (2003).  CMS has the authority to withhold all or a portion of a state's Medicaid funding if it concludes that the state is out of compliance with federal Medicaid requirements.  *See* 42 U.S.C. § 1396c; 42 C.F.R. §§ 430.1, 430.35(a), 430.40(a), 430.42(a), 447.304(c); *Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2604.

Federal law requires that each State Plan "provide for the establishment or designation of a single State agency to administer or to supervise the administration of" the Plan.  *See* 42 U.S.C. § 1396a(a)(5); *see also* 42 C.F.R. § 431.10(b)(1); *Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006).  The chosen agency may not delegate to others its "authority to supervise the plan or to develop or issue policies, rules, and regulations or program matter."  42 C.F.R. § 431.10(e)(1).  The Washington State Legislature has designated HCA as the agency responsible for administering Medicaid in

1   Washington and obtaining federal approval for the State Plan.[5]  *See* RCW

2   41.05.021(1)(m)(i); RCW 74.09.530(1)(a).

3        Medicaid clients receive their medical care either through a "fee-for-service"

4   system or a "managed care" system.  *G. v. State of Hawaii*, 703 F. Supp. 2d 1078, 1084

5   (D. Haw. 2010).  Under the fee-for-service model, "the state contracts directly with and

6   pays healthcare providers . . . for services they provide to Medicaid beneficiaries."  *Id.*

7   Under managed care, the state enters into contracts with MCOs which then provide the

8   required Medicaid services to Medicaid beneficiaries "through their own employees or by

9   contracting with independent providers."  *Id.*  There are approximately 246 children in

10  the State's Medicaid program currently receiving private duty nursing services.  (Kreiger

11  Decl. ¶ 7.)  Of these, 182 children are in the fee-for-service program and approximately

12  64 children are served through an MCO.  (*Id.*)

13       Under the managed care model in Washington, HCA provides a monthly premium

14  to an MCO for each enrolled Medicaid client and, in return, the MCO provides the

15  required medical care to the Medicaid client.  WAC 182-538-067(1); WAC 182-538-

16  070(1); *see also St. John Med. Ctr. v. State*, 38 P.3d 383, 386 (Wash. Ct. App. 2002) ("In

17  1993, [the State] began to contract with managed care organizations or providers for

18  managed care services to Medicaid recipients at a set rate per plan participant.").  Each

19  MCO is required to provide HCA adequate assurances that the MCO has the capacity to

20

21       [5] HCA partners with the Washington State Department of Social and Health Services

22  ("DSHS") in connection with certain Medicaid services, such as programs for disabled clients.
*See* RCW 41.05.021(1)(m)(iii); (Cody Decl. (Dkt. # 25) ¶ 3).

ORDER- 5

1  maintain a sufficient number, mix, and geographic distribution of health care providers to

2  meet the needs of their Medicaid clients and the network and quality standards of HCA.

3  *See* 42 U.S.C. § 1396u-2(b)(5); WAC 182-538-067(1)(c).  Medicaid clients who are

4  dissatisfied with the services provided by their MCO can initiate an internal grievance

5  and appeal process within the MCO, and then, if needed, appeal to HCA.  *See* 42 U.S.C.

6  § 1396u-2(b)(4); 42 C.F.R. § 438.402; WAC 182-538-110.

7       One aspect of the Medicaid program is known as the Early and Periodic

8  Screening, Diagnostic, and Treatment ("EPSDT") program.  *See* 42 U.S.C.

9  § 1396a(a)(43); *Katie A., ex rel. Ludin v. L.A. Cty.*, 481 F.3d 1150, 1154 (9th Cir. 2007).

10  As a general proposition, under the EPSDT program, the State must provide all forms of

11  medical assistance to Medicaid clients under the age of 21.  *See* 42 U.S.C. § 1396d(r)(5)

12  (defining services); *Katie A., ex rel. Ludin*, 481 F.3d at 1154.  "The EPSDT obligation is

13  thus extremely broad."  *Katie A., ex rel. Ludin*, 481 F.3d at 1154.  States must provide all

14  of the services listed in 42 U.S.C. § 1396d(a) to eligible children when such services are

15  found to be medically necessary.  *Id.*

16       The list of services in § 1396d(a) includes "private duty nursing services."  *See* 42

17  U.S.C. § 1396d(a)(8).  Indeed, HCA admits that "in-home nursing care for Medicaid

18  clients under age 21 is a mandatory service."  (PI Resp. at 9.)  EPSDT is also listed as a

19  required service in HCA's contracts with the MCOs.  (Cody Decl. ¶¶ 6-7.)  There is no

20  dispute that HCA has determined that Plaintiffs are eligible for Medicaid benefits and

21  HCA or one of HCA's MCOs has authorized each Plaintiff to receive in-home, private

22

1    duty nursing care for at least 16 hours per day.  (*See* PI Resp. at 10; *see also* Kreiger

2    Decl. ¶¶ 11-12, 15, 20; Edlund Decl. (Dkt. # 35) ¶ 5.)

3    **B.  Plaintiffs' Factual Circumstances**

4        Despite the fact that HCA has determined that each Plaintiff is eligible for and

5    HCA (or one of its MCOs) has authorized the provision of in-home, private duty nursing

6    care for at least 16 hours per day for each Plaintiff, none of the Plaintiffs are receiving

7    this amount of nursing care in their homes.  All of the Plaintiffs were referred to a home

8    health agency that provides private duty nursing services for children in Washington

9    State, including Medicaid enrolled children.  (Smith Decl. (Dkt. # 17) ¶ 7.)  The agency

10   was unable to recruit nurses to provide the 16 hours per day of private duty nursing to

11   which each Plaintiff is entitled.  (*Id.*)  The agency is unable to find qualified nurses who

12   are willing to work for the rates available for Medicaid-enrolled children.  (*Id.* ¶ 3.)  The

13   Medicaid pay rate for private duty nursing has not increased since July 2007.  (Austin

14   Decl. (Dkt. # 14) ¶ 4.)[6]

15       A.H.R. is a Medicaid client enrolled with an MCO, and he has been authorized to

16   receive 16 hours per day of in-home nursing care.  (Valderrama Decl. (Dkt. # 30) ¶ 2;

17

---

18       [6] HCA argues that the court should disregard the declarations of Ms. Molly Austin
     (Austin Decl.) and Ms. Sheri Smith (Smith Decl.) as self-serving.  (PI Resp. at 15-16.)  The
19   declarants at issue are employees of home health agencies that provide private duty nursing to
     Washington residents.  (Smith Decl. ¶ 2 (administrator); Austin Decl. ¶ 2 (chief operating
     officer).)  There is no evidence that either Ms. Smith or Ms. Austin will benefit directly if
20   Plaintiffs prevail on their motion for a preliminary injunction or in this lawsuit generally.  There
     is no evidence that the testimony of Ms. Smith or Ms. Austin is any more self-serving than the
21   testimony of any of Defendants' employees.  The court finds HCA's argument peculiar because
     HCA has acknowledged that the reimbursement rate for private duty nursing is too low in its
22   recent written statements to the Governor's office.  (*See infra* § II.C.)

ORDER- 7

1   Kreiger Decl. ¶ 12.)  A.H.R., who is less than one year old, resides in a group home for

2   medically fragile children because at the time of his discharge from Seattle Children's

3   Hospital on August 28, 2015, his family could not secure private duty, skilled nursing

4   care to meet his needs at their home.  (Gallagher Decl. (Dkt. # 8) ¶¶ 7-11; *see also*

5   Valderrama Decl. ¶ 5.)  A.H.R. receives the level of skilled nursing care in the group

6   home that his physicians have ordered (Valderrama Decl. ¶ 5), but to do so he is forced to

7   live separate from his family (Gallagher Decl. ¶ 9).  In the opinion of A.H.R.'s doctor,

8   "[t]he healthiest place for a child like A.H.R. is at home with his family."  (*Id.* ¶ 10.)

9   Further, A.H.R. has a hearing impairment and requires consistent one-to-one attention to

10   develop his communication skills.  (Aspinall Decl. (Dkt. # 42) ¶ 5.)  He is unable to

11   receive the consistent one-to-one attention he needs at the group home.  (*Id.* ¶ 6.)

12     S.K.,[7] who is two years old, relies on a mechanical ventilator to breathe.  (Redding

13   Decl. (Dkt. # 9) ¶¶ 4-5.)  S.K. requires at least 16 hours per day of private duty nursing to

14   live safely at home.  (*Id.* ¶¶ 10-11.)  HCA has authorized S.K. to receive this much

15   nursing care.  (Kreiger Decl. ¶¶ 15, 20; K.J. Decl. (Dkt. # 11) ¶ 4.)  Since S.K. was

16   discharged from Seattle Children's Hospital in November 2014, his family has had

17   difficulty recruiting a sufficient number of in-home, skilled nurses to provide S.K. with

18   16 hours per day of nursing care.  (K.J. Decl. ¶¶ 7-8.)  Presently, S.K.'s family receives

19   only five nights of nursing care per week and no nursing care during the day.  (*Id.* ¶ 8.)

20   _____

21     [7] S.K. is the only plaintiff in the fee-for-service portion of the State's Medicaid program.

22   (Kreiger Decl. ¶ 14.)

1    As a result, S.K.'s father must stay awake all night to attend to him on nights when the

2    family has no nursing assistance.  (*Id.*)  S.K.'s parents are exhausted as a result of his care

3    and worry that they could make a mistake in caring for him without a nurse to assist.  (*Id.*

4    ¶ 11.)  S.K. is at risk of being placed in a group home if additional nursing care is not

5    found for him soon.  (*Id.* ¶ 10.)  The parties dispute additional reasons that may inhibit

6    the recruitment and retention of private duty nurses for S.K.[8]

7        K.V. is a Medicaid client enrolled with an MCO.  (*See* Collymore Decl. (Dkt.

8    # 31) ¶ 2.)  Like S.K., K.V. is dependent on a ventilator to breathe.  (T.V. Decl. (Dkt.

9    # 16) ¶¶ 4-5.)  K.V.'s mother parents K.V. alone.  (*See id.* ¶ 6.)  Due to an emergency,

10   K.V. was hospitalized at Seattle Children's Hospital on June 25, 2015.  (*Id.* ¶ 7.)  K.V.

11

---

12   [8] HCA has submitted testimony indicating that the recruitment of nurses for S.K. appears
     to be complicated by additional factors including (1) that S.K. has lived part of the time in a hotel
13   or other small accommodations, (2) that Child Protective Services ("CPS") had some
     involvement with the family, and (3) conflict between the assigned nurses and S.K.'s parents.
     (*See* Kreiger Decl. ¶¶ 18-21.)  Plaintiffs object that the testimony upon which HCA relies is
14   based largely on hearsay.  (PI Reply (Dkt. # 39) at 11-12.)  The rules of evidence do not strictly
     apply in the context of a motion for preliminary injunction, and accordingly the court does not
15   abuse its discretion by considering hearsay evidence.  *See Republic of the Phil. v. Marcos*, 862
     F.2d 1355, 1363 (9th Cir. 1988); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.
16   1984).  "The exigencies of preliminary relief often prevent the movant from procuring
     supporting evidence in a form that would meet Rule 56's requirement of evidence admissible at
17   trial."  *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1562 (S.D. Cal.
     1996), *aff'd*, 109 F.3d 1394 (9th Cir. 1997).  Evidence such as hearsay testimony may be
18   considered by the court in the context of a motion for preliminary injunction, but the court has
     discretion to weigh the evidence as required to reflect its reliability.  *Id.*  The court notes the
19   hearsay quality of HCA's evidence in this regard.  In addition, Plaintiffs have submitted contrary
     testimony.  (*See generally* 2d K.J. Decl. (Dkt. # 41).)  Although S.K.'s mother acknowledges that
20   she needed to live for a short time in a hotel and that other living arrangements for S.K. have
     been small, she states that there has always been sufficient room for S.K.'s crib and necessary
21   equipment and that her home is clean.  (*Id.* ¶¶ 6, 12.)  She testifies that, although a CPS social
     worker investigated some allegations concerning S.K.'s living circumstances, the social worker
22   determined that there "was nothing behind the[] allegations."  (*Id.* ¶ 5.)  She also disputes that
     she fired or rejected any nurses because she did not like them, instead asserting that she did so
     for appropriate reasons concerning S.K.'s care.  (*Id.* ¶¶ 9-11, 16.)

was medically ready to be discharged on June 28, 2015, but K.V.'s family could not

secure 16 hours per day of private duty nursing care at home.  (*Id.*)  As a result, K.V. was

not discharged from the hospital until October 2, 2015, more than three months after K.V.

was medically ready to be discharged.  (*Id.* ¶ 8.)  K.V.'s family is still not able to obtain

more than five day shifts of nursing care each week.  (*Id.*)  As a result, K.V.'s mother

must go more than 24 hours without sleep on some days until nursing care arrives.  (*Id.*)

K.A.S. is a Medicaid client enrolled in an MCO.  (*See* Edlund Decl. ¶ 4.)  K.A.S.

is one year old with many serious medical problems.  (Evans Decl. (Dkt # 7) ¶¶ 3-9.)  On

September 15, 2015, the nursing agency that staffs K.A.S.'s private duty nurses informed

K.A.S.'s mother that as of September 23, 2015, there would be no nurses available to

assist with K.A.S.'s care in the family's home.  (*Id.* ¶ 15; I.S. Decl. (Dkt. # 13) ¶ 4.)  As a

result, K.A.S.'s parents provide all of her care at home.  (I.S. Decl. ¶ 5.)  K.A.S. requires

private duty nursing in her home and without it she will likely be placed in a hospital or

other institutional setting.  (Evans Decl. ¶ 17.)  HCA has submitted evidence indicating

that it has provided some but not all of the private duty nursing hours for which K.A.S.

has been approved, and that at least part of the difficulty in providing K.A.S. with

sufficient nursing is that there are limited nursing resources available in the remote area

of Washington in which K.A.S. lives.  (*See generally* Edlund Decl.)[9]

---

[9] In addition to the foregoing plaintiffs, Z.O.S. was also listed as a plaintiff in the original
and amended complaints.  (*See* Compl. ¶ 3; Am. Compl. ¶ 3.)  As noted above, however, on
December 29, 2015, Plaintiffs' counsel filed a notice of death concerning Z.O.S.  *See supra* note
1.  Z.O.S. was a Medicaid client enrolled with an MCO.  (Collymore Decl. ¶ 2.)  Like A.H.R.,
Z.O.S., who was two years old at the time of his death, resided in a group home for medically

1    **C.  Decision Package**

2         In October 2015, HCA submitted a request to the Governor's office for additional

3    funding for the medically intensive children's program for the state fiscal year beginning

4    July 1, 2016.  (Crain Decl. (Dkt. # 22) ¶ 2, Ex. B.)  The request is known as a "Decision

5    Package."  (*Id.* at 1.)  In the Decision Package, HCA states that it needs the additional

6    funding "to increase payment rates . . . to address decreased access to skilled nursing in

7    the home setting for a child who requires four to 16 hours of medically intensive care."

8    (*Id.*)  HCA also states that "[t]he current reimbursement rate is not competitive or

9    sufficient to prompt skilled nursing agencies to hire more staff to fill the need," and the

10   agencies "report they cannot compete with hospital nursing salaries as the rate of

11   reimbursement from Medicaid is so low."  (*Id.*)  HCA notes that "hospitals that specialize

12   in intensive children's care are calling . . . HCA to express their concern about the lack of

13   discharge options available to children who are stable and ready for discharge to skilled

14   nursing care."  (*Id.* at 2.)  Finally, HCA acknowledges that paying for private duty

15   nursing care is more cost effective than paying for extended hospital stays or other forms

16   of institutionalization that become necessary when private duty nursing is unavailable.

17   (*Id.* ("Paying for skilled nursing services . . . is a more cost-effective use of health care

18

19   fragile children.  (Striegl Decl. (Dkt. # 10) ¶ 10.)  At the time of his death, Z.O.S. lived apart
     from his family because at the time of his discharge from Seattle Children's Hospital on
     February 18, 2015, his family could not find sufficient at-home, skilled nursing care to meet his

20   needs.  (*Id.* ¶¶ 12-15.)  Prior to his hospitalization, Z.O.S. lived with at home with his family
     with skilled nursing support for 16 hours per day.  (*Id.* ¶ 6.)  However, even if a proper party,
     such as a successor or representative of Z.O.S., timely files a motion of substitution in this case

21   pursuant to Federal Rule of Civil Procedure 25, any preliminary injunction issued by the court
     with respect to the provision of private duty nursing would no longer apply to that party due to

22   Z.O.S.'s death.

ORDER- 11

dollars than extended hospital stays, which costs more for [the state's Medicaid program],

hospitals and the patients, who can be exposed to sources of infection and adverse health

care outcomes, which can require more treatment and consumes more health care

dollars.").)

## III.   ANALYSIS & CONCLUSIONS OF LAW

The parties have filed three motions:  (1) Plaintiffs' motion for a preliminary

injunction requiring HCA to provide Plaintiffs with 16 hours per day of private duty

nursing care, (2) HCA's Rule 19 motion to require joinder of certain MCOs, and (3)

HCA's motion to continue Plaintiffs' motion for a preliminary injunction.  The court will

address these motions in reverse order.

### A. HCA's Motion to Continue the Noting Date of Plaintiffs' Motion for a Preliminary Injunction

HCA has moved the court for an order to continue the noting date of Plaintiffs'

motion for a preliminary injunction until after the court decides HCA's Rule 19 motion.

(Mot. at 2.)  Plaintiffs noted their motion for a preliminary injunction on October 8, 2015.

(PI Mot. at 1.)  HCA noted its Rule 19 motion on November 13, 2015.  (Rule 19 Mot. at

1.)  The "noting" date of a motion is nothing more than the day on which a motion is

fully briefed by the parties and ready for the court's consideration.  *See* W.D. Wash.

Local Rules LCR 7(d).  In its motion, HCA urges the court to consider its Rule 19 motion

prior to Plaintiffs' motion for a preliminary injunction.  (*See generally* Mot.)  As a

practical matter, by the time the court began its consideration of either motion, the parties

had already fully briefed both motions.  (*See generally* Dkt.)  As a result, HCA's motion

1   to continue Plaintiffs' motion for a preliminary injunction until after the court has an

2   opportunity to consider HCA's Rule 19 motion is for all intents and purposes now moot.

3   Nevertheless, because the court is now in fact considering the parties' pending motions in

4   the order in which HCA desires, the court grants HCA's motion.

5       **B.  HCA's Rule 19 Motion**

6           HCA moves the court under Federal Rule of Civil Procedure 19 for an order

7   requiring the joinder of three MCOs through which four of the five Plaintiffs receive their

8   Medicaid services.[10]  (*See generally* Rule 19 Mot.; Cody Decl. (Dkt. # 25) ¶ 8.)  HCA

9   asserts that the court should either direct the joinder of these MCOs as necessary parties

10  under Rule 19 or dismiss the claims of the four Plaintiffs who receive their care from

11  MCOs.  (Rule 19 Mot. at 1-2.)  As the moving party, HCA bears the burden of

12  establishing that the MCOs are necessary parties.  *Nev. Eighty-Eight, Inc. v. Title Ins. Co.*

13  *of Minn.*, 753 F. Supp. 1516, 1522 (D. Nev. 1990) ("[T]he burden of proving that joinder

14  is necessary rests with the party asserting it."); *see also Shermoen v. United States*, 982

15  F.2d 1312, 1317 (9th Cir. 1992) (citing *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558

16  (9th Cir. 1990)) ("The moving party has the burden of persuasion in arguing for dismissal

17  [in a Rule 19 motion.]").

18          Rule 19(a), which governs the circumstances under which persons must be joined

19  as parties, provides in relevant part:

20  _____

21      [10] Plaintiffs receiving their Medicaid services through an MCO include:  A.H.R., K.A.S.,
    K.V. and Z.O.S.  (*See supra* § II.B.)  As noted above, however, Plaintiffs' counsel filed a notice
22  of death concerning Z.O.S. on December 29, 2015.  (*See supra* note 1.)

ORDER- 13

**(1) Required Party.** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

> **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or
>
> **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > **(i)** as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1) (bolding in original).

The application of Rule 19(a) involves three successive steps. *Wilbur v. Locke*, 423 F.3d 1101, 1111 (9th Cir. 2005), *abrogated on other grounds*, *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010). First, the court must determine whether a nonparty should be joined under Rule 19(a). *Wilbur*, 423 F.3d at 1112. The term "necessary" is used to describe those parties to be joined if feasible. *Id.* "The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application." *Shermoen*, 982 F.2d at 1317. "If an absentee is a necessary party under Rule 19(a), the second stage is for the court to determine whether it is feasible to order that the absentee be joined." *Wilbur*, 423 F.3d at 1112. "Finally, if joinder is not feasible, the court must determine at the third stage whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *Id.*; *see also Shermoen*, 982 F.2d at 1317 (a court must determine whether the absent

ORDER- 14

1  party is "indispensable" "so that in 'equity and good conscience' the suit should be

2  dismissed.").

3      The second and third steps are not at issue here.  The MCOs do not oppose joinder

4  if the court determines that the MCOs are necessary parties under step one.  (*See*

5  Stephens Decl. (Dkt. # 29) ¶ 3 ("Counsel for all three [MCOs] have represented . . . that

6  their clients do not oppose being joined in this lawsuit, provided they are allowed the

7  time by the ruled for submitting pleadings.").)  No party has asserted that joinder of the

8  MCOs is not feasible if the court were to determine that they are necessary parties to the

9  lawsuit.  The only issue here is whether the MCOs are in fact "necessary" parties.

10      "A party may be necessary under Rule 19(a) in three different ways."  *Salt River*

11  *Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012).  First,

12  under Rule 19(a)(1)(A), "a person is necessary if, in his absence, the court cannot accord

13  complete relief among existing parties."  *Id*. (citing Fed. R. Civ. P. 19(a)(1)(A)).

14  "Second, a person is necessary if he has an interest in the action and resolving the action

15  in his absence may as a practical matter impair or impede his ability to protect that

16  interest."  *Salt River*, 672 F.3d at 1179 (citing Fed. R. Civ. P. 19(a)(1)(B)(i)).  "Third, a

17  person is necessary if he has an interest in the action and resolving the action in his

18  absence may leave an existing party subject to inconsistent obligations because of that

19  interest."  *Salt River*, 672 F.3d at 1179 (citing Fed. R. Civ. P. 19(a)(1)(B)(ii)).  As a fourth

20  consideration, even when a party has an interest in the litigation, that party may not be

21  necessary under Rule 19(a) if the absent party is "adequately represented" by a present

22  party.  *Salt River*, 672 F.3d at 1180-81.  The court considers each possibility in turn.

1      **1.   Complete relief among existing parties**

2          As noted above, under Rule 19(a)(1)(A), a person is a necessary party if, in the

3   person's absence, the court cannot accord complete relief among existing parties.  *See*

4   Fed. R. Civ. P. 19(a)(1)(A).  Complete relief under Rule 19(a)(1)(A) is concerned with

5   "consummate rather than partial or hollow relief as to those already parties, and with

6   precluding multiple lawsuits on the same cause of action."  *Alto v. Black*, 738 F.3d 1111,

7   1126 (9th Cir. 2013).  To be "complete," relief must be "meaningful as between the

8   parties."  *Id.* (quoting *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d

9   861, 879 (9th Cir. 2004)).

10         HCA argues that the court could not accord complete relief to MCO-enrolled

11  Plaintiffs because "it is from the MCOs, not [HCA], from whom [sic] they receive

12  medically necessary services on a day-to-day basis."  (Rule 19 Mot. at 8-9.)  Further,

13  HCA argues that the MCOs "have committed themselves, through their contracts with

14  [HCA], to ensure those services are actually provided."  (*Id.* at 9.)  Plaintiffs respond that

15  the fact that HCA has contracted with the MCOs to provide the statutorily required care

16  to Plaintiffs does not mean that the court cannot award meaningful relief in the MCOs'

17  absence, and the court agrees.  "Even if a state delegates the responsibility to provide

18  treatment to other entities such as local agencies or managed care organizations, the

19  ultimate responsibility to ensure treatment remains with the state."  *Katie A., ex rel.*

20  *Ludin.*, 481 F.3d at 1159 (citing *John B. v. Menke*, 176 F. Supp. 2d 786, 801 (M.D. Tenn.

21  2001) (holding that a state cannot "disclaim responsibility for the ultimate provision of

22  EPSDT-compliant services by a once-removed provider")).  It is HCA, not the MCOs,

1  that bears the responsibility to ensure that the State Plan complies with federal law and

2  that Plaintiffs received the required treatment.  Indeed, as Plaintiffs point out, HCA could

3  disenroll Plaintiffs from the MCOs and arrange for them to receive the required nursing

4  care.  (Rule 19 Resp. (Dtk. # 43) at 7 (citing Cody Decl. (Dkt. # 25) Exs. B at 61-62, C at

5  61-62, D at 61-62).)  HCA never directly disputes this fact.[11]  Further, even if Plaintiffs

6  are not disenrolled from the MCOs, HCA acknowledges that it "certainly could enforce

7  the terms of [its] contracts [with the MCOs]."  (Rule 19 Mot. at 9.)  Thus, the court

8  cannot conclude that an award of "meaningful relief as between the parties" is impossible

9  in the absence of the MCOs.  *See Alto*, 738 F.3d at 1126; *see also Robertson v. Jackson*,

10  972 F.2d 529, 535-36 (4th Cir. 1992) (ruling, in an action to enjoin the Commissioner of

11  the Virginia Department of Social Services to bring state food stamp program into

12  compliance with federal act, that it was unnecessary to join the State Board of Social

13  Services and local social services agencies because neither the State Board nor the local

14  agencies were shown to be an impediment to the achievement of full compliance with

15  federal law and the Commissioner did not show that an order from the State Board to

16  local agencies was necessary to ensure compliance).

17

18

19  [11] HCA never expressly disputes that it could shift the four Plaintiffs at issue here out of
managed care.  (*See generally* Rule 19 Reply (Dkt. # 44).)  Instead, HCA raises the specter that
Plaintiffs are suggesting that HCA "just shift all medically intensive children from managed care

20  to fee-for-service."  (*Id.* at 3.)  Plaintiffs make no such suggestion.  (*See generally* Rule 19 Resp.)
There are only four infant or toddler Plaintiffs who are enrolled in an MCO and at issue in this
lawsuit. (Cody Decl. ¶ 8.)  This case is not a putative class action.  (*See generally* Am. Compl.)

21  This issue in this lawsuit is the provision of appropriate private duty nursing benefits to the five
Plaintiffs before the court.  The specter HCA raises—having to disenroll all medically intensive

22  children from managed care—is a straw man that the court disregards.

1       In *Disabled Rights Action Committee v. Las Vegas Events, Inc*, 375 F.3d 861 (9th

2   Cir. 2004), an advocacy organization sued the sponsor and presenter of a rodeo alleging

3   violations of the public accommodation provision of the Americans with Disabilities Act

4   ("ADA").  *Id.* at 866-67.  One of the defendants moved under Rule 19 to join the state

5   university system, which owned the arena where the rodeo was held.  *Id.* at 867.  The

6   district court granted the motion and directed the advocacy organization to join the state

7   university system.  *Id.*  The Ninth Circuit held that the district court erred "by failing to

8   consider whether remedies not requiring [the state university system's] cooperation

9   would provide meaningful relief."  *Id.* at 879.  The Ninth Circuit concluded that the

10  licensing agreement between the state university system and presenter did not prevent the

11  presenter from taking action to make the rodeo accessible, either within the scope of its

12  lease or by holding the rodeo at an alternative accessible location.  *Id.* at 880.  Indeed, the

13  Ninth Circuit noted that in the latter event, the presenter would be required to pay

14  liquidated damages to the state university system, not hold the rodeo at the state

15  university system's center despite its inaccessibility.  *Id.*  Thus, the plaintiffs could obtain

16  their objective of having the rodeo at an accessible location irrespective of the contractual

17  relationship between the presenter and the state university system.  *Id.*  Plaintiffs can

18  similarly obtain the relief they seek irrespective of HCA's contracts with the MCOs, as

19  discussed bove.  Indeed, in *Disabled Rights*, the Ninth Circuit did not view even the

20  specter of a contract dispute between the defendant and a third-party as requiring joinder

21  under Rule 19(a)(1)(A).  375 F.3d at 880.  Neither does this court.

22  *//*

1          **2.   The Interests of the MCOs**

2          Next, a person is a necessary party if the person has an interest in the action and

3     resolving the action in the person's absence may as a practical matter impair or impede

4     the person's ability to protect that interest.  *See* Fed. R. Civ. P. 19(a)(1)(B)(i).  In an

5     attempt to fit within this portion of Rule 19, HCA points to the MCOs' "administrative,

6     operational, and financial interests," whish arise from the MCOs' contracts with HCA

7     and the MCOs' enrollment of four of the five Plaintiffs.  (Rule 19 Mot. at 9; *see also* Rule

8     19 Reply at 1 ("The MCOs must be joined to the case because any preliminary injunction

9     would have an immediate and direct effect on their business practices.").)  Rule

10    19(a)(1)(B)(i) does not protect every interest an absentee party may have.  For example,

11    "a financial stake in the outcome of the litigation" does not give rise to Rule

12    19(a)(1)(B)(i) necessity.  *See Disabled Rights*, 375 F.3d at 880, 883.  Only "legally

13    cognizable interests," *id.* at 880, or "legally protected interests" are within the Rule's

14    scope, *id.* at 883 (citing *Makah Indian Tribe*, 910 F.2d at 558).  Thus, the interest HCA

15    asserts on behalf of the MCOs—that the present litigation may have an effect on the

16    MCOs' operations and bottom lines—does not constitute a "legally protected interest"

17    under Rule 19(a)(1)(B)(i).

18         The fact that HCA and the MCOs are in a contractual relationship concerning the

19    provision of health care services to Plaintiffs does not suffice as a "legally protected

20    interest" in this context either.  The Ninth Circuit has held that "a district court cannot

21    adjudicate an attack on the terms of a negotiated agreement without jurisdiction over the

22    parties to that agreement."  *Clinton v. Babbit*, 180 F.3d 1081, 1088 (9th Cir. 1999); *see*

ORDER- 19

1   *also Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157

2   (9th Cir. 2002) ("[A] party to a contract is necessary, and if not susceptible to joinder,

3   indispensable to litigation seeking to decimate that contract."). The Ninth Circuit,

4   however, reads its precedent in this regard narrowly. Where an action is not "an action to

5   set aside a contract, . . . an attack on the terms of a negotiated agreement, or litigation

6   seeking to decimate a contract," absentee signatories are not necessary parties. *See*

7   *Disabled Rights*, 375 F.3d at 881 (citations, quotation marks, and alterations omitted).

8   Plaintiffs' suit does not represent "an attack" on the agreements between HCA and the

9   MCOs. Plaintiffs assert only claims for statutory violations against HCA with respect to

10  HCA's obligation to provide Plaintiffs with the health care services at issue. (*See*

11  *generally* Am. Compl.) Indeed, the legal claims of S.K., the only Plaintiff in Medicaid's

12  fee-for-service program, are indistinguishable from the claims of A.H.R., K.V., and

13  K.A.S., the Plaintiffs in Medicaid's MCO program. (*See generally id.*) Although

14  Plaintiffs' suit may tangentially relate to HCA's contracts with the MCOs, it does not

15  represent an attack on those contracts or seek to set them aside. Accordingly, the court

16  concludes HCA has failed to identify any "legally protected interest" of the MCOs that

17  requires their joinder under Rule 19(a)(1)(B)(i).

18      **3.   Inconsistent Obligations**

19          Under Rule 19, a person also may be a necessary party if the person has an interest

20  in the action and resolving the action in the person's absence may leave an existing party

21  subject to inconsistent obligations because of that interest. *See* Fed. R. Civ. P.

22  19(a)(1)(B)(ii). HCA argues that the court should require joinder of the MCOs under

1   Rule 19(a)(1)(B)(ii) because resolving Plaintiffs' suit may leave HCA "subject to

2   inconsistent obligations" due to its "ongoing reliance on the MCOs to adhere to their own

3   contractual obligations." (*See* Rule 19 Mot. at 9.)  HCA, however, fails to offer any

4   specific factual basis or explanation as to how this suit might leave it subject to

5   inconsistent obligations if the MCOs adhere or fail to adhere to their contractual

6   obligations.  The fact that HCA may be faced with enforcing its contractual rights against

7   the MCOs or may be subject to the payment of contractual damages to the MCOs as a

8   byproduct of this litigation does not constitute being subject to "inconsistent obligations"

9   under Rule 19(a).  *See* Fed. R. Civ. P. 19(a)(1)(B)(ii).

10          The Ninth Circuit counsels that "[i]nconsistent obligations are not the same as

11  inconsistent adjudications or results."  *See Cachil Dehe Band of Wintun Indians of the*

12  *Colusa Indian Cmty. v. California*, 547 F.3d 962, 976 (9th Cir. 2008) (alterations

13  omitted) (adopting the approach taken by the First Circuit and quoting *Delgado v. Plaza*

14  *Las Ams., Inc.*, 139 F.3d 1, 3 (1st Cir. 1998) (per curiam)).  Inconsistent obligations occur

15  when a party is unable to comply with one court's order without breaching another

16  court's order concerning the same incident.  *Id.*  The court agrees with Plaintiffs that

17  HCA cannot encounter the risk of inconsistent obligations in this case because the MCOs

18  and Plaintiffs share no common cause of action against HCA.  Plaintiffs' causes of action

19  are based on their statutory private rights of action to Medicaid services and disability

20  accommodations.  HCA, on the other hand, faces potential contractual disputes with its

21  MCOs.  Even if, hypothetically, HCA were found to have violated Plaintiffs' statutory

22  rights and another court found that either HCA or the MCOs had their breached

1   contractual obligations to one another, nothing in this scenario suggests that HCA would

2   be faced with inconsistent court orders.  The fact that HCA may face the possibility of

3   contractual disputes with its MCOs while simultaneously adhering to its statutory

4   obligations to provide private duty nursing to Plaintiffs does not rise to the level of a

5   "substantial risk" of incurring "inconsistent obligations."  *See id.* (citing Fed. R. Civ. P.

6   19(a)(1)(B)(ii)).

7   **4.  Adequate Representation**

8   Even if the MCOs have an interest in Plaintiffs' suit against HCA, the MCOs may

9   not be necessary parties under Rule 19(a) if their interests are otherwise adequately

10   represented here.  *See Salt River*, 672 F.3d at 1180-81.[12]  The court considers three

11   factors in determining whether an existing party adequately represents the interests of an

12   absent party:  (1) "whether the interests of a present party to the suit are such that it will

13   undoubtedly make all of the absent party's arguments"; (2) "whether the party is capable

14   of and willing to make such arguments"; and (3) "whether the absent party would offer

15   any necessary element to the proceedings that the present parties would neglect."  *Id.* at

16   1180 (quoting Shermoen,982 F.2d at 1318).

17   The Ninth Circuit's decision in *Salt River* illustrates how these rules should be

18   applied.  In *Salt River*, the owner and operator of a power plant on Navajo Nation land

19

20   _____

21   [12] The parties do not address this issue, but the court does because the failure to do so
may be reversible.  *See Salt River*, 672 F.3d at 1180 ("As we said in *Shermoen*, [982 F.2d at
1318,] '[i]f a legally protected interest exists, the court must further determine whether that

22   interest will be *impaired* or *impeded* by the suit.  Impairment may be minimized if the absent
party is adequately represented in the suit.'") (italics in original).

1   were defendants in an employment case brought in the tribal court.  *Id.* at 1177.  In a

2   federal-court declaratory judgment action against Navajo officials, the power plant

3   sought to bar the application of tribal law to the employment case.  *Id.* at 1177-78.  The

4   tribe was absent from the federal case, and the tribal officers argued that the tribe was a

5   necessary party to the litigation because the complaint challenged the lease agreement.

6   *Id.* at 1178.  The district court agreed and dismissed the action under Rule 19 because the

7   tribe could not be joined due to sovereign immunity.  *Id.*  The Ninth Circuit reversed the

8   district court, finding that the tribal officials adequately represented the tribe.  *Id.* at

9   1180-81.  The officials' interests were aligned with the tribe's interests.  *Id.* at 1180.  No

10  evidence suggested that the officials would be unable to make every reasonable argument

11  the tribe itself would make.  *Id.*  And no evidence suggested the tribe would "offer any

12  necessary elements to the action that the Navajo officials would neglect."  *Id.* at 1180-81.

13  The Navajo tribe was therefore not a necessary party, and the case could proceed.  *Id.* at

14  1182.

15      Here, the interests of HCA and the MCOs are similarly aligned.  HCA

16  acknowledges that "[w]hile [HCA] remains ultimately responsible for the administration

17  of the Medicaid program" (Rule 19 Mot. at 2), "[t]he MCOs . . . have contracts under

18  which they have assumed the obligation of providing virtually all medically necessary

19  services" to four of the five Plaintiffs in this suit (*id.* at 1).  Further, HCA and the MCOs

20  are obligated under their contracts to "fully cooperate" with each other in the conduct of

21  this litigation, including "by providing without additional fee all reasonably available

22  information relating to such actions and by providing necessary testimony."  (Cody Decl.

ORDER- 23

1  Exs. B at 35, C at 35, D at 35.)  Thus, the interests of HCA and the MCOs are

2  overlapping with respect to Plaintiffs' claims, and the contractual provisions regarding

3  cooperation ensure that the MCOs will share with HCA any evidence they may have that

4  is relevant to this suit.  In addition, the court finds no reason to believe that the MCOs can

5  make arguments that HCA cannot, and the conduct of the litigation to date suggests no

6  such deficiency.  Accordingly, the court concludes that HCA is likely to make and is

7  capable of making all the same arguments that the MCOs would make.  *See Salt River*,

8  672 F.3d at 1180.

9          Finally, the court cannot conclude that the MCOs would add any element to this

10  proceeding that HCA would neglect.  *See id.*  HCA reserves the right in its contracts with

11  the MCOs "to issue unilateral amendments which provide corrective or clarifying

12  information," and the contracts specify that any provisions that are found to be "in

13  conflict with applicable state or federal laws or regulations" are automatically "amended

14  to conform to the minimum requirements of such laws or regulations."  (*See* Cody Decl.

15  Exs. B at 30, C at 30, D at 30.)  Thus, in the event this litigation results in a ruling that

16  HCA violated any federal statutory rights of Plaintiffs in a manner that impacts HCA's

17  contracts with the MCOs, HCA has the contractual authority to alter those contracts

18  unilaterally or automatically.  The court, therefore, cannot conclude that the MCOs

19  "would offer any necessary element to the proceedings that the present parties would

20  neglect."  *See Salt River*, 672 F.3d at 1180.

21          In sum, HCA has failed to meet its burden under Rule 19(a) of demonstrating that

22  the MCOs are necessary parties to this litigation.  HCA has failed to demonstrate that (1)

1   complete relief cannot be awarded in the absence of the MCOs, (2) the MCOs have a

2   legally protected interest in the conduct of this litigation that is cognizable under Rule

3   19(a), or (3) HCA runs a substantial risk of being subject to inconsistent obligations in

4   the MCOs' absence.  Further, even if HCA could demonstrate that the MCOs have a

5   legally protected interest in Plaintiffs' suit, those interests are adequately represented by

6   HCA.  Accordingly, the court concludes that the MCOs are not necessary parties, and

7   denies HCA's Rule 19 motion for joinder.[13]

8   **C. Plaintiffs' Motion for a Preliminary Injunction**[14]

9   Plaintiffs seek a preliminary injunction under Federal Rule of Civil Procedure 65

10   requiring HCA to "arrange and pay for" private duty nursing care in their homes that

11   Plaintiffs' doctors have assessed Plaintiffs need and to which HCA has acknowledged

12   Plaintiffs are entitled.  (*See* PI Mot. at 2; *see also* PI Resp. at 1 ("The issue here is *not*

13   whether [Plaintiffs] are entitled to medically necessary nursing services from the

14   Medicaid Program.  They are." (italics in original)).)  Specifically, Plaintiffs request a

15   preliminary injunction that enjoins HCA "from failing to take all actions within [its]

---

[13] Plaintiffs also argue that the MCOs should not be joined under the public rights exception to Rule 19 joinder.  (Rule 19 Resp. at 13-15.)  The court declines to consider this argument, however, because it found that HCA failed to carry its burden under Rule 19 without resort to this judicially created exception to Rule 19.

[14] A preliminary injunction is not a preliminary adjudication of the ultimate merits of the suit.  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).  The court does not make binding findings or conclusions, it need only find probabilities that the necessary facts can be proved.  *Id.*; *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").  With these precepts in mind, and pursuant to Federal Rule of Civil Procedure 65, the court considers Plaintiffs' motion for a preliminary injunction.

1  power necessary to make medical assistance available and to arrange for . . . Plaintiffs to

2  receive 16 hours per day of private duty nursing, as arranged and agreed by . . . Plaintiffs

3  and their medical providers."  (Prop. PI Ord. (Dkt. # 6-1) at 12.)  HCA opposes the

4  imposition of a preliminary injunction.  (*See generally* PI Resp.)  The court now

5  considers Plaintiffs' motion.

6  **1.  Standards for a Preliminary Injunction**

7  "A plaintiff seeking a preliminary injunction must establish that he [or she] is

8  likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the

9  absence of preliminary relief, that the balance of equities tips in his [or her] favor, and

10  that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555

11  U.S. 7, 20 (2008).  A plaintiff may also qualify for a preliminary injunction by showing

12  that there are serious questions going to the merits of his or her claim and that the balance

13  of hardships tips sharply in his or her favor, so long as the irreparable harm and the public

14  interest factors in *Winter* are also met.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d

15  1127, 1134-35 (9th Cir. 2011).

16  Here, however, Plaintiffs seek not just to maintain the status quo with a

17  prohibitory injunction but to require HCA to undertake take affirmative actions—

18  specifically, to "arrange and pay for" private duty nursing care in Plaintiffs' homes.  (PI

19  Mot. at 2.)  A request for a mandatory injunction seeking relief well beyond the status

20  quo is disfavored in the law and shall not be granted unless the facts and law clearly favor

21  the moving party.  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319-20 (9th Cir. 1994).  In

22  general, mandatory injunctions should not be granted "unless extreme or very serious

1 damage will result" and should not be issued "in doubtful cases or where the injury

2 complained of is capable of compensation in damages." *Anderson v. United States*, 612

3 F.2d 1112, 1115 (9th Cir. 1979); *see also Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir.

4 2010) (stating that "the movant must make a heightened showing of the four factors"

5 (citation and quotation marks omitted)).  Because the standard for entry of a mandatory

6 injunction is higher, the court declines to consider Plaintiffs' motion under the Ninth

7 Circuit's alternative balancing test in *Cottrell*, but will stick to the more narrowly drawn

8 test utilized by the Supreme Court in *Winter*.

9 **2. Likelihood of Success on the Merits**

10 Plaintiffs have asserted a claim under 42 U.S.C. § 1983 alleging that HCA violated

11 their civil rights by failing to comply with certain provisions of the Medicaid Act (*see*

12 Am. Compl. ¶¶ 107-16) and a claim under Title II of the ADA and Section 504 of the

13 Rehabilitation Act of 1973 alleging that HCA failed to provide private duty nursing

14 services in the most integrated setting appropriate to Plaintiffs' needs (*see id.* ¶¶ 117-36).

15 The court now considers the likelihood of Plaintiffs' success on the merits of these two

16 claims.

17 **a. Medicaid Act**

18 Under 42 U.S.C. § 1396a(a)(10)(A), "[a] state plan for medical assistance must

19 provide . . . for making medical assistance available [for described services] to" all

20 individuals who meet certain eligibility requirements.  *See* 42 U.S.C. § 1396a(a)(10)(A).

21 States must provide medical assistance "with reasonable promptness to all eligible

22 individuals," and that assistance must not be "less in amount, duration, or scope than the

1  medical assistance made available to any other" beneficiary under the plan.  42 U.S.C.

2  §§ 1396a(a)(8), 1396a(a)(10)(B).

3         Until recently, where the Medicaid Act referred to "medical assistance," it stated

4  that states were responsible for providing "payment of part or all of the cost of services."

5  42 U.S.C. § 1396d(a) (2009).  Some federal courts interpreting this language defined

6  "medical assistance" narrowly, limiting a state's obligation to providing financial

7  assistance only.  *See, e.g.*, *Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003)

8  ("[T]he statutory reference to 'assistance' appears to have reference to *financial*

9  assistance rather than to actual medical *services[.]*" (italics in original)); *Westside*

10  *Mothers v. Olszewski*, 454 F.3d 532, 540 (6th Cir. 2006) ("[W]e do not believe

11  §§ 1396a(a)(8), 1396a(a)(10) require the State to provide medical services directly.  The

12  most reasonable interpretation of § 1396a(a)(8) is that all eligible individuals should have

13  the opportunity to apply for medical assistance, i.e. financial assistance[.]"); *Mandy R. ex*

14  *rel. Mr. & Mrs. R. v. Owens*, 464 F.3d 1139, 1146 (10th Cir. 2006) ("[T]he Medicaid

15  statute does not require states to be service-providers of last resort . . . . The State must

16  pay for medical services, but it need not provide them.").  Other federal courts held that a

17  state's obligation under the Medicaid Act went beyond mere payment of financial

18  assistance.  *See Bryson v. Shumway*, 308 F.3d 79, 88-89 (1st Cir. 2002) (holding that

19  there was a valid cause of action where plaintiffs sought to require the state to provide

20  more slots in its state waiver plan); *Doe v. Chiles*, 136 F.3d 709, 718-19 (11th Cir. 1998)

21  (holding there was a valid cause of action where plaintiffs sought to require the state to

22

ORDER- 28

1  admit them into an intermediate care facility for the mentally retarded with reasonable

2  promptness).

3         As part of the Patient Protection and Affordable Care Act, Congress amended the

4  definition of "medical assistance" under 42 U.S.C. § 1396d(a).  *See Leonard v.*

5  *Makereth*, No. 11-7418, 2014 WL 512456, at *6 (E.D. Pa. Feb. 10, 2014).  Under the

6  most recent iteration of the statute, "[t]he term 'medical assistance' means payment of

7  part or all of the cost of the following care and services *or the care and services*

8  *themselves, or both[.]*"  42 U.S.C. § 1386d(a) (2013) (italics added).  As one court noted,

9  it appears that Congress intended "to clarify that where the Medicaid Act refers to the

10  provision of services, a participating State is required to provide (or ensure the provision

11  of) services, not merely to pay for them[.]"  *John B. v. Emkes*, 852 F. Supp. 2d 944, 951

12  (M.D. Tenn. 2012); *see also Dunakin v. Quigley*, 99 F. Supp. 3d 1297,  (W.D. Wash.

13  Apr. 10, 2015).[15]  This court agrees.

14

      _____

15       [15] The House Committee Report on the amendment is noteworthy.  It states, in relevant
16  part:

17       ["Medical assistance"] is expressly defined to refer to payment but has generally
     been understood to refer to both funds provided to pay for care and services and
18   to the care and services themselves.  The Committee, which has legislative
     jurisdiction over Title XIX of the Social Security Act, has always understood the
19   term to have this combined meaning.  Four decades of regulations and guidance
     from the program's administering agency, the Department of Health and Human
20   Services, have presumed such an understanding and the Congress has never given
     contrary indications.

21       Some recent court opinions have, however, questioned the longstanding practice
     of using the term "medical assistance" to refer to both the payment for services
22   and the provision of the services themselves.  These opinions have read the term
     to refer only to payment  . . . .  If the term meant only payments, the statutory

ORDER- 29

1    As noted above, there is no dispute that private duty nursing is an EPSDT service

2  that HCA is required to provide to Medicaid clients, like Plaintiffs, who are under the age

3  of 21. (*See supra* § II.A.; PI Resp. at 9); *see also* 42 U.S.C. §§ 1396d(a)(8), 1396d(a).

4  Indeed, at oral argument, counsel for HCA admitted that the provision of 16 hours per

5  day of private duty nursing care to Plaintiffs "is a legal requirement." There also is no

6  dispute that HCA has determined Plaintiffs to be eligible for Medicaid benefits and HCA

7  or one of HCA's MCOs has authorized each Plaintiff to receive in-home nursing care for

8  at least 16 hours per day. (PI Resp. at 10; *see also* Kreiger Decl. ¶¶ 11-12, 15, 20;

9  Edlund Decl. ¶ 5.) There is also no dispute that Plaintiffs S.K., K.A.S., and K.V. are not

10

---

11    requirement that medical assistance be furnished with reasonable promptness "to
      all eligible individuals" in a system in which virtually no beneficiaries receive

12    direct payments from the state or federal governments would be nearly
      incomprehensible . . . . To correct any misunderstandings as to the meaning of the

13    term, and to avoid additional litigation, the bill would revise section 1905(a) . . .
      to conform this definition to the longstanding administrative use and

14    understanding of the term.

15  H.R. Rep. No. 111-299, pt. 1 at 649-50.

16    HCA argues that Plaintiffs' interpretation of the amendment to the term "medical
    assistance" is somehow "incorrect and incomplete." (PI Resp. at 13.) HCA correctly asserts that

17  "[t]he 2010 amendment was intended to clarify the long-standing intent of Congress that
    'medical assistance' did not mean simply the payment for medical services, but ensuring the
    provision of those services," and "did not change prior Congressional intent but only made the

18  intent more explicit." (PI Resp. at 14.) On this basis, however, HCA implicitly argues that the
    amendment, in effect, changed nothing. (*See id.*) Although the amendment may be consistent

19  with prior Congressional intent, it is not consistent with the manner in which HCA interpreted
    the prior statutory language. Earlier this year, the defendants in *Dunakin*, including the Director

20  of HCA, argued before this court, even after the enactment of the new statutory language, that
    HCA was merely required to pay for Medicaid services and not provide them. *See Dunakin*, 99

21  F. Supp. 3d at 1320 ("Defendants assert that the Social Security Act requires only that they
    promptly pay for Medicaid-covered services, and not that they arrange for or provide for such

22  services."). This interpretation is inconsistent with the amended statutory language. *See id.*
    Accordingly, the court finds this portion of HCA's briefing disingenuous and unpersuasive.

1  receiving the number of hours of private duty nursing in their homes to which they have

2  been approved and are entitled, that A.H.R. is presently living in a group home for

3  medically fragile children because he is unable to secure the private duty nursing hours at

4  home to which he is entitled, and that A.H.R.'s family is unable to care for him at home

5  without this assistance.  (*See supra* § II.A.)

6      In enacting the statutes governing the requirements for state medical assistance

7  plans under the Medicaid Act, "Congress clearly and unambiguously conferred rights" to

8  those required services to individuals entitled to receive such benefits and "[did] not

9  preclud[e] individual enforcement of those rights."  *Sabree ex rel. Sabree v. Richman*,

10  367 F.3d 180, 194 (3d Cir. 2004).  Individuals entitled to benefits may enforce their

11  rights under the Medicaid Act through a civil rights claim brought under 42 U.S.C.

12  § 1983.  *Sabree*, 367 F.3d at 194.  Thus, Plaintiffs are entitled to enforce their rights to

13  private duty nursing through a claim under § 1983.

14      Despite the foregoing facts and law, HCA argues that Plaintiffs are not likely to

15  succeed on the merits of their § 1983 claim.  HCA asserts that it has "expended

16  considerable energy and resources in seeking and obtaining in-home nursing services and

17  other care for [Plaintiffs]."  (PI Resp. at 2.)  HCA points to the number of hours of private

18  duty nursing that it has provided to some of the Plaintiffs in their homes and the

19  difficulties it has faced in securing more.  (PI Resp. at 14-17.)  HCA, however, never

20  argues that it has provided the full in-home, private duty nursing benefit to which

21  Plaintiffs are entitled or that it has done all it can do to secure 16 hours per day of private

22  duty nursing for Plaintiffs.  (*See generally id.*)

ORDER- 31

1    HCA argues that the difficulties in securing private duty nursing for some

2   Plaintiffs may be due in part to issues specific to that particular Plaintiff.  Specifically,

3   HCA has made these arguments with respect to S.K. and K.A.S.  (*See* Edlund Decl. ¶¶

4   11-13; Kreiger Decl. ¶¶ 14-27; *see supra* § II.B. & note 8.)  The court has noted the poor

5   quality of some of this evidence and the rebuttal evidence submitted by Plaintiffs.  (*See*

6   *supra* note 8.)  HCA also criticizes as self-serving certain declarations that Plaintiffs

7   submit from administrators at private nursing agencies, who indicate that the difficulty in

8   recruiting sufficient numbers of in-home, private duty nurses is related to HCA's low

9   Medicaid reimbursement rates for this type of nursing.  (*See* PI Resp. at 15-17 (criticizing

10  Smith Decl. & Austin Decl.)); *see also supra* note 6.  Despite HCA's arguments to this

11  court that reimbursement rates are not at the heart of the private duty nursing hiring and

12  retention issues here, HCA took precisely the opposite position when it sought additional

13  funding for private duty nursing from the Governor's office in the Decision Package.

14  (*See* Crain Decl. Ex. B; *supra* § II.C.)  HCA stated that it was actually paying for more

15  expensive care in institutional settings, such as hospitals, because the state's

16  reimbursement rate for private duty nursing is presently too low.  (*See* Crain Decl. Ex. B

17  at 1 ("HCA is experiencing decreased access to skilled nursing care . . . . The current

18  reimbursement rate is not competitive or sufficient to prompt skilled nursing agencies to

19  hire more staff to fill the need. . . . Currently, there is a notable gap between supply and

20  demand in the area of home based skilled nursing care resources.").)  Given HCA's

21  admissions in the Decision Package, the court concludes that Plaintiffs are likely to

22  prevail over HCA on the merits of this issue.

ORDER- 32

1    HCA also argues that the court should not find HCA to be out of compliance with

2    the Medicaid Act because CMS has not found HCA to be out of compliance and the court

3    should defer to CMS.  (*Id.* at 17.)  HCA cites no authority for this proposition, but the

4    court presumes that HCA is relying upon *Chevron U.S.A., Inc. v. Natural Resources*

5    *Defense Council, Inc*., 467 U.S. 837 (1984), under which courts accord substantial

6    deference to an agency interpretation of a statute under certain circumstances.  HCA,

7    however, has submitted no evidence that CMS is aware of the issues in this lawsuit or has

8    made any determination with respect to HCA's compliance with the Medicaid statute

9    here.  (*See generally id.*)  There is, therefore, no agency decision or interpretation to

10   which the court could defer.  The court agrees with Plaintiffs that it cannot grant *Chevron*

11   deference to an agency opinion that has not been offered.  (*See* PI Reply at 9.)

12        Finally, HCA argues that Plaintiffs are not likely to succeed on the merits of their

13   claim because they failed to pursue their administrative remedies prior to filing suit.  (*Id.*

14   at 18.)  Plaintiffs are correct, however, that there is no requirement to exhaust

15   administrative remedies with respect to their 42 U.S.C. § 1983 or ADA claims.  *See Patsy*

16   *Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) (holding that exhaustion of

17   administrative remedies is not necessary to bring a claim under § 1983); *O'Guinn v.*

18   *Lovelock Corr. Ctr.*, 502 F.3d 1056, 1061 (9th Cir. 2007) (citing *Zimmerman v. Or. Dep't*

19   *of Justice*, 170 F.3d 1169, 1178 (9th Cir. 1999)) ("We recognize that neither Title II of

20   the ADA nor section 504 of the Rehabilitation Act generally requires administrative

21   exhaustion before filing suit."); (*see also* PI Reply at 11).

22

1   Plaintiffs have provided substantial evidence that HCA has failed to arrange for

2   the provision of private duty nursing care at home for Plaintiffs and has improperly

3   delegated this responsibility to Plaintiffs' families or parents.  The court concludes that

4   Plaintiffs are likely to succeed in their § 1983 claim that HCA failed to provide and

5   arrange for medical assistance with reasonable promptness as required by the Medicaid

6   Act.

7   **b.  Title II of the ADA**

8   Plaintiffs have also asserted a claim under the Title II of the ADA.  (*See* Am.

9   Compl. ¶¶ 117-36.)  Title II of the ADA prohibits discrimination in access to public

10  services by requiring that "no qualified individual with a disability shall, by reason of

11  such disability, be excluded from participation in or be denied the benefits of the services,

12  programs, or activities of a public entity, or be subjected to discrimination by any such

13  entity."  42 U.S.C. § 12132.  The Ninth Circuit has counseled that "the ADA must be

14  construed broadly in order to effectively implement the ADA's fundamental purpose of

15  providing a clear and comprehensive national mandate for the elimination of

16  discrimination against individuals with disabilities."  *Barden v. City of Sacramento*, 292

17  F.3d 1073, 1077 (9th Cir. 2002) (quotation marks and alteration omitted).

18  One form of disability discrimination is a violation of the ADA's "integration

19  mandate."  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 592, 600-01 (1999).  This

20  mandate, which is embodied in the ADA and its implementing regulations, specifies that

21  persons with disabilities receive services in the "most integrated setting appropriate to

22  their needs."  28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs,

1  and activities in the most integrated setting appropriate to the needs of qualified

2  individuals with disabilities.").  The integration mandate "serves one of the principal

3  purposes of Title II of the ADA:  ending the isolation and segregation of disabled

4  persons."  *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005).  Thus,

5  under Title II of the ADA, HCA has an obligation to provide medically necessary

6  services, such as the private duty nursing services at issue here, in the most integrated

7  setting appropriate to Plaintiffs' needs.  *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d);

8  *see also Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (ruling that a state's

9  failure to provide services to a qualified person in a community-based setting as opposed

10  to a nursing home presents a violation of Title II of the ADA).

11      In *Olmstead*, the Supreme Court concluded that discrimination under Title II of

12  the ADA includes "unnecessary segregation" and "[u]njustified isolation" of people with

13  disabilities.  527 U.S. at 582, 600-01.  The Supreme Court found unjustified isolation of

14  people with disabilities amounts to discrimination because it "perpetuates unwarranted

15  assumptions that persons so isolated are incapable or unworthy of participating in

16  community life" and "severely diminishes everyday life activities of individuals,

17  including family relations, social contacts . . . educational independence, educational

18  advancement, and cultural enrichment."  *Id.* at 601.  The Court held that "[u]njustified

19  isolation . . . is properly regarded as discrimination based on disability."  *Id.* at 597.  The

20  Court held that public entities are required to provided community-based services for

21  persons with disabilities who would otherwise be entitled to institutional services when

22  (a) treatment professionals have determined that community-based services are

1    appropriate for an individual, (b) the individual does not oppose such services, and (c) the

2    services can be reasonably accommodated, taking into account the resources available to

3    the state and needs of others who are receiving disability services from the state. *Id.* at

4    607.

5            Here, Plaintiffs assert A.H.R. has been unnecessarily segregated or unjustifiably

6    isolated because he no longer lives at home with his family, instead resorting to care in a

7    group home due to the lack of private duty nursing services.  (PI Reply at 4-5.)  Plaintiffs

8    also argue that the fact that some Plaintiffs (S.K., K.V. and K.A.S.) still live in their

9    homes does not abrogate their claims under the ADA.  (PI Mot. at 13.)  "A state's

10   reduction in services may violate the integration mandate where it unjustifiably forces or

11   will likely force beneficiaries from an integrated environment into institutional care" or a

12   segregated setting.  *G. v. Hawaii*, No. CIV. 08-00551 ACK-BM, 2010 WL 3489632, at

13   *9 (D. Haw. Sept. 3, 2010) (citing *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175,

14   1184 (3d Cir. 2003)) (holding that Medicaid participants not currently institutionalized,

15   but at "high risk for premature entry into a nursing home," could bring claims for

16   violation of the integration mandate); *Gaines v. Hadi*, No. 06–60129–CIV., 2006 WL

17   6035742, at *28 (S.D. Fla. Jan. 30, 2006) (observing that a plaintiff may state an

18   integration claim by asserting that a "reduction in services will force [him] into an

19   institutional setting against [his] will"); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161,

20   1170 (N.D. Cal. 2009) (noting that "cases involving ADA integration claims have

21   recognized that the risk of institutionalization is sufficient to demonstrate a violation of

22   Title II," and enjoining the enforcement of a law that would reduce the number of Adult

1   Day Health Care days available to certain Medicaid beneficiaries because the reduction

2   would place the plaintiffs at serious risk of institutionalization); *Mental Disability Law*

3   *Clinic v. Hogan*, CV-06-6320 (CPS)(JO), 2008 WL 4104460 (E.D.N.Y. Aug. 29, 2008)

4   ("[E]ven the risk of unjustified segregation may be sufficient under Olmstead.")).  Here,

5   there is substantial evidence that those Plaintiffs still living at home will likely be forced

6   into group homes or institutionalized care unless they are able to secure 16 hours of

7   private duty nursing care within a short period of time.  (*See supra* § II.B.)

8        HCA also argues that A.H.R. is not "institutionalized" because the group homes,

9   which provide licensed care and supervision to medically fragile children, are "a

10  community-based option available to all [P]laintiffs as an alternative to

11  institutionalization."  (PI Resp. at 19.)  HCA argues that "medical institutions" are

12  defined under the Washington Administrative Code as hospitals, nursing facilities,

13  psychiatric residential treatment facilities, and residential habilitation centers.  (*Id.* at 20

14  (citing WAC 388-145-1305 and WAC 182-500-0050).)  The court, however, does not

15  find the State's definition of a "medical institution" particularly relevant here.  Although

16  a residential group home may be the most integrated setting for a disabled adult under

17  similar circumstances, Plaintiffs are not adults but infants and toddlers.  "The 'most

18  integrated setting' is the one that 'enables individuals with disabilities to interact with

19  nondisabled persons to the fullest extent possible.'"  *M.R. v. Dreyfus*, 697 F.3d 706, 734

20  (9th Cir. 2011.)  Simply labeling a setting as "community-based" does not obviate the

21  legal requirement to engage in a fact-based, individualized inquiry.  There is no dispute

22  that all of these Plaintiffs have been authorized by HCA to receive in-home, private duty

1 nursing care and that their physicians approve such care. Accordingly, the "most

2 integrated setting appropriate" to Plaintiffs' needs here is their family homes. *See* 42

3 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

4       HCA also raises a "fundamental alteration" defense. (PI Resp. at 21-22.) ADA

5 regulations provide that "[a] public entity shall make reasonable accommodations in

6 policies, practices, or procedures when modifications are necessary to avoid

7 discrimination on the basis of disability, unless the public entity can demonstrate that

8 making the modifications would fundamentally alter the nature of the service, program,

9 or activity." 28 C.F.R. § 35.130(b)(7). "*Olmstead* made clear that courts evaluating

10 fundamental alteration defenses must take into account financial and other logistical

11 limitations on a state's capacity to provide services to the disabled[.]" *Townsend*, 328

12 F.3d at 520. When evaluating a fundamental alteration defense, a court must consider

13 "not only the cost of providing community-based care to the litigants, but also the range

14 of services the State provides to others with . . . disabilities, and the State's obligation to

15 mete out those services equitably." *Olmstead*, 527 U.S. at 597. The ADA requires home

16 or community-based placement of disabled persons only if "the placement can be

17 reasonably accommodated, taking into account the resources available to the State and

18 the needs of others with . . . disabilities." *Id.* at 607; *see also Sanchez*, 416 F.3d at 1067-

19 68; *Arc of Wash. State*, 427 F.3d at 618-19. Budgetary concerns alone, however, do not

20 sustain a fundamental alteration defense. *See Fisher*, 335 F.3d at 1183 ("If every

21 alteration in a program or service that required the outlay of funds were tantamount to a

22 fundamental alteration, the ADA's integration mandate would be hollow indeed.").

1    The problem with HCA's argument is that it is unsupported by evidence.  (*See* PI

2    Resp. at 21-22.)  HCA cites to evidence concerning the efforts it or its MCOs have made

3    to secure the required nursing services for Plaintiffs.  (*See id.* at 22 (citing Kreiger Decl.

4    ¶¶ 24-25; Collymore Decl. ¶ 6; Edlund Decl. ¶¶ 9-13).)  However, HCA submits no

5    evidence that granting Plaintiffs' motion for a preliminary injunction will result in any

6    fundamental alteration of any other state Medicaid program or result in fund-shifting that

7    would unduly disadvantage any other segment of Washington's disabled population.  The

8    record in this case does not show that HCA will likely have to make a fundamental

9    alteration in its medically intensive care program or any other Medicaid program in order

10   to comply with the ADA's integration mandate here.  Accordingly, the court concludes

11   that Plaintiffs have shown a likelihood of success on the merits of their claim under Title

12   II of the ADA.[16]

13       **3.  Irreparable Harm**

14       Next, the court considers whether Plaintiffs will likely suffer irreparable harm.

15   *Winter*, 555 U.S. at 20.  Plaintiffs argue that they will suffer irreparable injury in the

16   absence of a preliminary injunction.  (PI Mot. at 14-15.)  They point out that A.H.R. has

17   already been forced out of his own home and into a group home as a result of HCA's

18   inadequate provision of private duty nursing services.  (*See supra* § II.B.)  Plaintiffs have

19

20       [16] HCA also argues that Plaintiffs seek the functional equivalent of the writ of mandamus

21   to state court officials.  (PI Resp. at 22-23.)  To the extent Plaintiffs were seeking a writ of
     mandamus, the court would lack jurisdiction to enter such a writ against state officials.  *See*

22   *Demos v. U.S. Dist. Court for E. Dist. of Wash.*, 925 F.2d 1160, 1161 (9th Cir. 1991).  The court
     rejects HCA's analogy of Plaintiffs' suit to a writ of mandamus.

1  submitted substantial evidence that placement of infants and toddlers in institutional

2  settings or group homes can have serious, life-long impact on both their physical and

3  mental health.  (*See generally* Cowan Decl.)  Plaintiffs also argue that the other three

4  Plaintiffs face serious risks of injury to their health and other harms by living in their

5  homes without adequate nursing support or the serious risk of being forced into a group

6  home or some other institutional settings as a result of HCA's inadequate provision of

7  private duty nursing services.  (*See supra* § II.B.)

8         "Numerous federal courts have recognized that the reduction or elimination of

9  public medical benefits irreparably harms the participants in the programs being cut."

10  *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1121 (N.D. Cal. 2009) (citing *Beltran v. Myers*,

11  677 F.2d 1317, 1322 (9th Cir. 1982) (holding that the possibility that plaintiffs would be

12  denied Medicaid benefits sufficient to establish irreparable harm); *Newton-Nations v.*

13  *Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) (citing *Beltran* and finding irreparable

14  harm shown where Medicaid recipients could be denied medical care as a result of their

15  inability to pay increased co-payment to medical service providers); *Edmonds v. Levine*,

16  417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) (finding that state Medicaid agency's denial

17  of coverage for off-label use of prescription pain medication would irreparably harm

18  plaintiffs)); *see also K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 493 (D. Idaho

19  2014) (finding that developmentally disabled adults were likely to suffer irreparable harm

20  where, due to reduction of payments for home and community-based services, many

21  named plaintiffs in the class action were at risk of being institutionalized, and all of them

22  risked stagnating or more likely regressing in their functional levels because of reduced

1    levels of support they could afford with their diminished benefits), *aff'd K.W. ex rel.*

2    *D.W. v. Armstrong*, 789 F.3d 962 (9th Cir. 2015); *see also M.R. v. Dreyfus*, 697 F.3d 706,

3    739 (9th Cir. 2012) (reversing, in an ADA case, the denial of a preliminary injunction

4    seeking to block decreases in state Medicaid expenditures for in home personal care

5    services provided to disabled individuals and concluding the plaintiffs were likely to

6    suffer irreparable injury due to "serious risk of institutionalization").  HCA never

7    addresses these authorities or explains why they would not control here.  (*See* PI Resp. at

8    23.)

9         HCA argues that "plaintiffs will not suffer irreparable harm if the [c]ourt allows

10   the [HCA] and the MCOs to continue in their attempts to determine the additional

11   services that are needed and may be available."  (*Id*.)  First, HCA's statement ignores that

12   fact that it has already determined the "services that are needed."  There is no dispute that

13   HCA has approved each Plaintiff herein for 16 hours per day of private duty nursing

14   services.  (*See* PI Resp. at 10 (citing Kriegler Decl. ¶¶ 11, 12; Edlund decl. ¶¶ 4, 5)

15   ("Each Plaintiff . . . has been authorized by the [HCA] or an MCO to receive in-home

16   nursing care of 16 hours per day.").)  Therefore, there is no need for HCA to make

17   additional determinations concerning the services that are needed—that issue has been

18   resolved.  Further, the law does not support HCA's position that it is sufficient for it to

19   "attempt[] to determine the additional services that . . . *may* be available."  (*Id.* (italics

20   added).)  As noted above, Congress has recently clarified that where the Medicaid Act

21   refers to the provision of services, a participating State is required to provide (or ensure

22   the provision of) the services themselves—not simply determine the additional services

1    that "may be available."  42 U.S.C. § 1386d(a); *John B.*, 852 F. Supp. 2d at 951;

2    *Dunakin*, 99 F. Supp. 3d at 1321; *see also* H.R. Rep. No. 111-299, pt 1 at 649-50.

3    Finally, HCA entirely ignores the abundance of case authority that has found irreparable

4    harm when medical services are eliminated or reduced in similar situations.  Accordingly,

5    the court finds that Plaintiffs have established that they are likely to suffer irreparable

6    harm in the absence of a preliminary injunction.[17]

7        **4.  Balance of the Equities and the Public Interest**

8        The two final inquires presented by Plaintiffs' motion for a preliminary injunction

9    are whether the balance of hardships tips in their favor and whether the public will

10   benefit from the proposed preliminary injunction.  *Winter*, 555 U.S. at 20.  These factors

11   may be viewed together.  *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1087 (N.D.

12   Cal. 2013) (citing *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 989 (N.D. Cal. 2010)).

13   The court must "balance the interests of all parties and weigh the damage to each."  *L.A.*

14   *Mem'l Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir.

15   1980).  In conjunction, the court must consider "whether there exists some critical public

16

17   [17] HCA argues that this situation is not like cases in which a state agency has eliminated
     medical services for certain groups of individuals or eliminated or reduced funding for such

18   services because here HCA has not denied that Plaintiffs are eligible for Medicaid, not "denied
     coverage for any aspect of the full scope of Medicaid services," and not "denied requests for

19   coverage of in-home nursing services."  (*See* PI Resp. at 10, *see also id* at 23 ("The situation
     might be different if the [HCA] had denied . . . [P]laintiffs eligibility for Medicaid, or if the

20   [HCA] and the MCOs had rejected authorization for nursing services, or if the [HCA] or the
     MCOs had refused to try to find nursing services.").)  The court, however, can discern no

21   difference in the irreparable harm to Plaintiffs or the balance of equities regardless of whether
     the State overtly denies services that are due, eliminates or reduces funding for such services, or

22   authorizes such services but then fails in its duty to provide the services.  The harm to Plaintiffs
     is the same in any of these events, and as discussed below, the balance of equities still favors
     Plaintiffs.

1   interest that would be injured by the grant of preliminary relief." *Indep. Living Ctr. of S.*

2   *Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009), *vacated in part on other*

3   *grounds*, *sub nom Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, --- U.S. ---, 132 S. Ct.

4   1204 (2012).

5          In the context of providing public benefits, the Ninth Circuit has observed:

6          We have several times held that the balance of hardships favors
           beneficiaries who may be forced to do without needed medical services
7          over a state concerned with conserving scarce resources.

8   *M.R. v. Dreyfus*, 697 F.3d 706, 737-738 (9th Cir. 2011) (citing, as an example*, Indep.*

9   *Living Ctr. of S. Cal.*, 572 F.3d at 659 (holding that state budgetary considerations do not,

10  in social welfare cases, constitute a critical public interest that would be injured by

11  injunctive relief)).  The fact that HCA may incur expenses while providing these benefits

12  to Plaintiffs pending the outcome of the litigation does not outweigh the harm to

13  Plaintiffs in the absence of the benefits.  "Faced with . . . a conflict between financial

14  concerns and preventable human suffering, [the court] has little difficulty concluding that

15  the balance of hardships tips decidedly in Plaintiff[s'] favor."  *See Lopez v. Heckler*, 713

16  F.2d 1432, 1437 (9th Cir. 1983); *see also Haskins v. Staton*, 794 F.2d 1273, 1277 (7th

17  Cir. 1986) (finding that where an injunction seeks to require defendants to comply with

18  existing law, the injunction imposes no burden but "merely seeks to prevent the

19  defendants from shirking their responsibilities").  Further, the Ninth Circuit also

20  recognizes a robust public interest in safeguarding access to health care for those eligible

21  for Medicaid, whom Congress recognizes as the most needy in the country.  *M.R.*, 697

22  F.3d at 738.

1    In any event, it is not clear that HCA will save money by failing to provide the in-

2    home nursing care at issue here given the higher costs of institutionalized or group home

3    care or the costs that HCA may have to incur should the lack of private duty nursing

4    services result in injury to Plaintiffs.  Indeed, in its Decision Package, HCA has

5    acknowledged that "[i]ncreasing the utilization of skilled nursing services for children is

6    a better use of state dollar[s] than paying for . . . more costly alternatives," such as

7    "extended hospital stays, emergency room visits, [and] inpatient readmissions."  (Crain

8    Decl. Ex. B at 2.)  Thus, the balance of hardships favors Plaintiffs "in light of evidence in

9    the record that suggests that [the action to be enjoined] may have an adverse, rather than

10   beneficial, effect on the State's budget."  *M.R.*, 697 F.3d at 738 (citing *Dominguez v.*

11   *Schwarzenegger*, 596 F.3d 1087, 1098 (9th Cir. 2010)).  Given these considerations, the

12   court finds that both the balance of the equities and the public interest favor Plaintiffs.

13   In sum, the court finds that all of the factors set forth in *Winter* for granting a

14   preliminary injunction favor Plaintiffs and decidedly so.  In the absence of a preliminary

15   injunction, the health and welfare of Plaintiffs is at grave risk.  The court concludes that

16   Plaintiffs have met the heightened standard for imposition of a mandatory preliminary

17   injunction.

18   **5.  The Scope of the Preliminary Injunction**

19   The court now considers the scope of the preliminary injunction that should be

20   imposed.  Indeed, many of HCA's arguments appear to be aimed at its concerns

21   regarding the scope of the preliminary injunction and its mandatory nature.  (*See* PI Resp.

22   at 14-15.)  The injunction Plaintiffs request is as follows:

> Defendants are enjoined from failing to take all actions within their power necessary to make medical assistance available and to arrange for . . . Plaintiffs to receive 16 hours per day of private duty nursing, as arranged and agreed by Plaintiffs and their medical providers.

(Prop. PI Ord. at 12.)   In *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1152 (9th Cir. 2007), the plaintiffs alleged that they and a similarly-situated class of individuals were entitled to and had not received "medically necessary mental health services in a home-like setting." *Id.* at 1152.  The district court granted the plaintiffs' motion for a mandatory preliminary injunction directing the state defendants to screen members of a statewide class of foster children and, where medically necessary, provide the children with certain forms of mental health and therapeutic foster care. *Id.* at 1151. Although the Ninth Circuit ultimately held that the district court had misinterpreted the Medicaid Act with respect to the type of mental health services that the state was required to provide, the Ninth Circuit found no error in the district court's articulation or application of the legal standard for issuance of a mandatory preliminary injunction. *Id.* at 1156.  In so ruling, the Ninth Circuit stated:

> First, the district court correctly described the applicable test for the granting of a preliminary injunction . . . as well as the heightened standard that applies to mandatory injunctive relief . . . . Second, in concluding that plaintiffs were entitled to a mandatory preliminary injunction, the district court correctly applied these tests.  The court found that plaintiffs had a strong likelihood of success on the merits of their Medicaid Act claims.  It also discussed the possibility that plaintiffs would face unnecessary institutionalization without the preliminary injunction, recognized that such harms were "grave," and rejected defendants' arguments that plaintiffs failed to show that they faced irreparable harm.  It is evident that the court concluded that plaintiffs faced the potential for irreparable injury without the injunction. . . . The court's finding of a strong likelihood that plaintiffs would succeed on the merits of their claims also evidences a conclusion

ORDER- 45

that the law and facts clearly favor plaintiffs, meeting the requirement for
issuance of a mandatory preliminary injunction.

*Id.* at 1156-57 (footnote and internal citations omitted).  As in *Katie A., ex rel. Ludin*, this

court has recognized and applied both the test for a preliminary injunction and the

heightened test for entry of a mandatory injunction.[18]

In addition, as in *Katie A., ex rel. Ludin*, the court explicitly recognizes "the

federalism principles that require federal courts to grant each state the widest latitude in

the dispatch of its own internal affairs and to find a threat of immediate and irreparable

harm before enjoining a state agency's operations."  *See Katie A., ex rel. Ludin*, 481 F.3d

at 1157 (internal quotation marks omitted).  Based on the court's discussion of the harm

Plaintiffs face in the absence of sufficient private duty nursing care, *see supra* § III.C.3,

there is no doubt that the court finds a threat of immediate and irreparable harm to

Plaintiffs in the absence of a preliminary injunction.  Further, the preliminary injunction

Plaintiffs request "require[s] only that defendants supply the services that the court found

to be required under federal law."  *Katie A., ex rel. Ludin*, 481 F.3d at 1157.  "It [does]

not mandate detailed or burdensome procedures for compliance."  *Id.*  Further, like the

district court in *Katie A., ex rel. Ludin*, this court will "allow[] defendants an opportunity

jointly to develop the remedial plan needed to implement the injunction."  *See id.* at 1157.

In order to effectuate the court's order, counsel for HCA and for Plaintiffs shall meet and

confer and develop a plan for implementing this preliminary injunction.  Among other

---

[18] Further, the court applied the more recent formulation of the test for a preliminary
injunction as articulated by the Supreme Court in *Winter*.  555 U.S. at 20.

1   things, the plan must identify the responsibilities of Defendants, the need for additional

2   providers, methods of finding, securing, and retaining additional providers, and a timeline

3   for accomplishing needed tasks.  In negotiating the plan, counsel shall diligently and in

4   good faith take into account and apply this court's rulings and observations in this case.

5   "No further deference [i]s required."  *Id*.

6         **6. Bond Requirement**

7         Federal Rule of Civil Procedure 65(c) "invests the district court with discretion as

8   to the amount of security required, *if any*."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919

9   (9th Cir. 2003) (internal quotation marks omitted; italics in original).  Plaintiffs, who are

10  Medicaid recipients, request that the court waive the bond requirement on grounds that

11  they are indigent.  (PI Mot. at 22-23.)  Counsel for HCA acknowledged during oral

12  argument that, if the court were to impose a preliminary injunction here, it should not

13  require Plaintiffs to post a bond.  Accordingly, the court will not require Plaintiffs to post

14  a bond for the preliminary injunction to take effect.

15            **IV.   CONCLUSION**

16        Based on the foregoing, the court DENIES HCA's Rule 19 motion (Dkt # 24), and

17  GRANTS HCA's motion to continue (Dkt. # 28).

18        In addition, the court GRANTS Plaintiffs' motion for a preliminary injunction

19  (Dkt # 6) as more fully described herein and specifically ORDERS as follows:

20        Pursuant to Federal Rule of Civil Procedure 65(a), Defendants shall take all

21  actions within their power necessary for Plaintiffs to receive 16 hours per day of private

22  duty nursing, as previously authorized by Defendants and arranged and agreed to by

1    Plaintiffs and their medical providers.  In order to effectuate this requirement, counsel for

2    Defendants and Plaintiffs shall meet and confer as soon as practicable and develop a plan

3    for implementing the preliminary injunction.  Among other things, the plan must identify

4    the responsibilities of Defendants, the need for additional providers, methods of finding,

5    securing, and retaining additional providers, and a timeline for accomplishing needed

6    tasks.  However, Defendants may not defer or delay their efforts to provide the required

7    private duty nursing care to Plaintiffs while the parties are developing the plan.  In

8    negotiating the plan, counsel shall diligently and in good faith take into account and

9    apply this court's rulings and observations.  Not later than 30 days from the entry of this

10   order, Defendants and Plaintiffs shall file a joint status report regarding the status of

11   effectuating the preliminary injunction.

12       Dated this 7th day of January, 2016.

13

14

15   JAMES L. ROBART
16   United States District Judge

17

18

19

20

21

22

ORDER- 48